## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

JAN DAVID IGNOWSKI,       )
       Plaintiff,      )
           )
     v.       )     CAUSE NO.: 2:12-CV-459-PRC
           )
CAROLYN W. COLVIN,      )
Acting Commissioner of the      )
Social Security Administration,     )
       Defendant.     )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Jan David Ignowski on November 8, 2012, and a Plaintiff's Memorandum in Support of [His] Motion for Summary Judgment [DE 18], filed by Plaintiff on September 20, 2013. Plaintiff requests that the June 30, 2011 decision of the Administrative Law Judge denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") be reversed and remanded for further proceedings. On December 19, 2013, the Commissioner filed a response, and Plaintiff filed a reply on January 23, 2014. For the following reasons, the Court grants Plaintiff's request for remand.

## BACKGROUND

Plaintiff had knee surgery in 2007. Two months after the surgery, he presented to the emergency room twice on the same day for seizure activity. He had a seizure at work in November 2008, and, as a result, Plaintiff lost his job in March 2009. In June 2009, Plaintiff had complaints of dizziness and disorientation while driving. In 2009, Plaintiff began to suffer from depression, much of which was related to his seizure disorder and his inability to find work and provide for his family. Plaintiff's work history was as a machine operator for twenty-two years. Plaintiff reported nighttime seizures in January 2011 and ongoing depression.

On September 10, 2009, Plaintiff filed applications for DIB and SSI, alleging an onset date of August 10, 2009, based on complaints of seizures, a sleeping disorder, and depression. The applications were denied initially on November 9, 2009, and upon reconsideration on June 9, 2010. Plaintiff timely requested a hearing, which was held on June 15, 2011, before Administrative Law Judge ("ALJ") Patricia Witkowski Supergan. In appearance were Plaintiff, his wife Dawn Morgan, his attorney Christopher Boudi, and vocational expert Randall L. Harding. The ALJ issued a written decision denying benefits on June 30, 2011. She made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.    The claimant has not engaged in substantial gainful activity since August 10, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: seizure disorder, adjustment disorder with depressed mood, substance abuse disorder, chronic obstructive pulmonary disease ("COPD") and sleep disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c). The claimant can occasionally climb ramps and stairs, but never ladders, ropes or scaffolds. The claimant can frequently balance, stoop, kneel, crouch and crawl, but must avoid all exposure to hazards such as moving machinery or unprotected heights. The claimant is limited to simple, repetitive and routine work tasks.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born [in 1965] and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.	The claimant has at least a high school education and is able to communicate in English (20 FR 404.1564 and 416.964).

9.	Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.	Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 405, 1569(a), 416.969, and 416.969(a)).

11.	The claimant has not been under a disability, as defined in the Social Security Act, from August 10, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(AR 22-36).

On September 12, 2012, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. On November 8, 2012, Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

**STANDARD OF REVIEW**

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous

legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate her analysis of the evidence in order to allow the reviewing court to trace the path of her reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that, as a reviewing

court, we may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and [the ALJ's] conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled,

and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). The RFC "is an administrative assessment of what work-related activities an individual can perform despite [the individual's] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff seeks reversal and remand of the ALJ's finding of not disabled on the basis that the ALJ failed to (1) properly analyze Plaintiff's seizure disorder, (2) properly analyze the opinion of Dr. Hafner-Nettleto, Plaintiff's treating psychologist, and (3) discuss the credibility findings of state agency reviewing physicians. The Commissioner responds that the ALJ's credibility and RFC determinations are supported by substantial evidence.

As an initial matter, neither Plaintiff nor the Commissioner provided a factual background containing a summary of Plaintiff's relevant medical history. The Court warns counsel for each party that any failure to include such a summary of a plaintiff's medical history by either party in future social security appeals cases may result in the Court striking the offending brief.

## A. Seizures

Plaintiff first argues that the ALJ failed to properly analyze the credibility of his statements regarding his seizure disorder and the effect of his seizure disorder on his residual functional capacity ("RFC"). At the hearing, Plaintiff testified to daytime and nighttime seizures, with the nighttime seizures occurring once a week. He testified that he had seizures even though he took his anti-seizure medication. Plaintiff's wife reported that he had seizures once a week. Plaintiff testified that he thought he had milder seizures weekly. In her decision, the ALJ accepted that Plaintiff had a seizure disorder, finding it to be a "severe" impairment and included restrictions in the RFC for never climbing ladders, ropes, or scaffolds and avoiding all exposure to hazards such as moving machinery or unprotected heights.

Nevertheless, Plaintiff contends that the ALJ erred by failing to determine the frequency of Plaintiff's seizures and how the seizures would affect his ability to work. In support, Plaintiff cites *Boiles v. Barnhart*, 395 F.3d 421, 426 (7th Cir. 2005); *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004); *Delgado v. Colvin*, No. 3:12-CV-53, 2013 WL 2431160, at *13 (N.D. Ind. June 4, 2013); and *Mohr v. Astrue*, No. 1:09-CV-2425, 2010 WL 3420050, at *11 (N.D. Ill. Aug. 24, 2010).

As to Plaintiff's contention that an ALJ must make a finding specifically quantifying the frequency of seizures in formulating the RFC, none of these cases support such a requirement. In *Boiles* and *Barnett*, the court was concerned with the failure of the ALJ to determine the frequency

of seizures in the context of making a step three determination under the Listings, which Plaintiff does not contest in this case. Rather, Plaintiff argues that the ALJ erred in determining his RFC. Moreover, the ALJ cited the state agency physicians' opinions in finding that Plaintiff's seizures did not meet or medically equal the relevant Listings. In *Delgado*, the ALJ was not faulted for failing to consider the frequency of the seizures but rather in failing to "reconcile how Plaintiff could maintain employment *despite evidence of the frequency of her pseudoseizures*." 2013 WL 2431160, at *13. In *Delgado*, the evidence of record established that the frequency of the plaintiff's seizures was incompatible with full-time employment. *Id.* Similarly, in *Mohr*, the concern was not that the ALJ had failed to quantify the frequency of the plaintiff's seizures but rather that the ALJ had substituted his own opinion for the detailed medical evidence to determine that the frequency of seizures would not prevent the plaintiff from working. 2010 WL 3420050, at *11. Unlike in *Delgado* and *Mohr*, the ALJ in this case discussed all the evidence of record regarding the frequency of Plaintiff's seizures, of which there was little other than his own testimony and that of his wife.

Plaintiff also contends that the ALJ relied on erroneous reasoning to reject the alleged frequency of Plaintiff's seizures when the ALJ found that there was limited objective support for the asserted frequency of seizures and that the diagnostic testing and clinical findings had been essentially normal. Rather, Plaintiff asserts that the medical evidence supports his report of seizures. First, he contends that, when he was first diagnosed with seizure disorder, the paramedics witnessed his seizure. (Pl. Br. 7). However, it is not clear from the record cited by Plaintiff that the paramedics actually witnessed the seizure as opposed to having reported the seizure. The July 7, 2007 emergency room record notes that Plaintiff was being seen for a second episode of seizures and provides, in relevant part, that, having been discharged after his first seizure that day, "[t]he patient

felt reasonably okay and was at home laying on the couch when suddenly he had another episode and he fell off the couch and onto the floor. *The paramedics noted seizures lasting 45 seconds*, which was generalized and possibly focal." (AR 328). Plaintiff had bitten his tongue, he was combative and confused after the seizure, and he was taken back to the emergency room. Regardless of whether the paramedics witnessed the seizure or not, the ALJ found that Plaintiff suffers from a seizure disorder.

Plaintiff cites five other records, with no analysis, to support the statement that "[r]ecords indicated continued seizures after his first diagnosis." (Pl. Br. 7). First, Plaintiff cites the record for the December 1, 2008 follow up visit after the November 18, 2008 seizure at work. Second, on December 24, 2008, Plaintiff saw Dr. Difillipo for a follow up evaluation for hypertension medication refills; under "history of present illness" it is noted that he had the seizure at work in November 2008, he had stopped taking seizure medication, and he was seeing a neurologist. Third, on June 24, 2009, a phone message from Plaintiff reported that he had been experiencing episodes of dizziness that began on June 23, 2009, and that he was not aware of having any seizures but that his wife thinks that is what happened. Plaintiff's Dilantin and liver levels were going to be checked. Fourth, Plaintiff cites a July 2, 2009 treatment note from the Hammond Clinic for follow up from the possible seizure on June 23, 2009. The plan was to do labs and an EEG to compare to the 2007 EEG. Finally, Plaintiff cites a January 21, 2011 progress note from the Catherine Mcauley Clinic for follow up that reports Plaintiff's wife stating that she thought Plaintiff had seizures at night. Plaintiff also points to the July 9, 2007 MRI that was taken when he was admitted for seizures as further evidence supporting his claim of the frequency of his seizures that the ALJ ignored. Plaintiff

correctly notes that the MRI showed no acute infarct but did show atrophy of bilateral frontal lobes, more pronounced for his age.

Again, all of this evidence demonstrates that Plaintiff suffers from seizures, which the ALJ discussed and credited. But none of the evidence shows a severity greater than that articulated by the ALJ. The ALJ noted that Plaintiff's last public seizure was in November 2008. The ALJ noted that Plaintiff's wife indicated that he did not have daytime seizures but that his nighttime seizures made him "out of it." (AR 27). The ALJ noted both the findings of July 2007 MRI identified by Plaintiff above as well as the repeat MRI in 2009 that was *normal*, which Plaintiff fails to mention. Plaintiff also fails to mention that the consistently normal EEGs with no epileptiform activity in September 2007, January 2009, July 2009, January 2010, and February 2011, all of which the ALJ discussed. The ALJ found that, in September 2009, Plaintiff reported that his seizures were better and that he was tolerating the addition of Keppra to his medications. The ALJ further recounted the medical evidence and noted that Plaintiff continued to follow up with his primary care doctor and a specialist with medication adjustments and that he had no complaints of seizure activity through 2009 and most of 2010. The ALJ also considered that in late 2010 and early 2011, Plaintiff's wife reported that she thought he was having seizures in his sleep due to twitching and incontinence. Yet, the ALJ then noted that the February 2011 EEG was normal. At that time, Plaintiff was continued on Keppra. The ALJ's discussion of all this evidence supports her finding that the record showed relatively few instances of seizure activity.

Plaintiff argues that the ALJ relied on erroneous reasoning to reject the alleged frequency of Plaintiff's seizures when the ALJ noted the limited objective support in the record and the essentially normal diagnostic testing and clinical findings. Plaintiff faults the ALJ for failing to

specify which diagnostic tests and clinical findings would demonstrate the frequency of Plaintiff's seizure disorder. Yet, Plaintiff fails to identify the repeat normal EEGs that were discussed in detail by the ALJ in the decision and the sparsity of reported episodes of seizures to his treating physicians. Plaintiff also contends that the ALJ failed to acknowledge that, because EEGs are taken during a seizure-free interval, in 30% of patient with seizures, the EEG is normal. Yet, this argument is speculative as Plaintiff offers no citation to evidence of record for this fact or that this fact is applicable to him.

Plaintiff testified that he did not always go to the emergency room or notify his doctor when he had a seizure. From this, the ALJ found that Plaintiff's "inaction tends to indicate that his seizure activity is not as severe or problematic as he alleges." (AR 31). Plaintiff faults the ALJ for this conclusion as well. Yet, the Plaintiff fails to note the ALJ's citation to Plaintiff's September 2009 report that his seizures were better, just one month after his alleged onset date. Plaintiff then had no reports of seizures through December 2009 and into 2010. Although Plaintiff reported in January 2011 some problems with possible seizure activity at night, the ALJ noted that seizures were not reported on any consistent basis and that the February 2011 EEG was normal. Thus, the ALJ's finding that the record does not support a frequency of seizures of once or twice daily, even at night, as alleged, is supported by substantial evidence. The omission of any discussion of the 2009 MRI and the repeatedly normal EEGs by Plaintiff in his brief is telling.

In response to the ALJ's notation that Plaintiff "indicated that he always does not report seizures to his doctor or get treatment," (AR 31), Plaintiff argues that the ALJ did not indicate what treatment Plaintiff could have gotten after a seizure or how going to the emergency room would have helped. Plaintiff testified that at the emergency room, they would send him home. Plaintiff argues

that the ALJ erred because he testified that he "mostly stayed at home so there would be no way to objectively measure how many seizures he had at home." (Pl. Br. 7). As discussed above, the ALJ considered all of the evidence of record , especially the sparse recent evidence concerning Plaintiff's complaints of night-time seizures, and the ALJ did not doubt that Plaintiff experienced symptoms from his seizures by factoring them into the RFC.

Plaintiff also argues that medication is the only treatment for seizure disorder, and Plaintiff was prescribed and taking anti-seizure medication. However, Plaintiff cites no record evidence for this assertion. Moreover, the ALJ specifically found that Plaintiff had consistently taken the same anti-seizure medications over the relevant time period, noting that "[t]he medical evidence and treatment notes indicate that seizure medications are monitored as to dosage and changed as necessary" and "[h]is doctors regularly monitored his dosages and medications with lab results taken." (AR 31).

Plaintiff next argues that the ALJ erred by finding that Plaintiff's use of controlled substances undermines his credibility with regard to his seizures. Plaintiff tested positive for marijuana when he was first diagnosed in July 2007, and in a March 2009 treatment record, it is noted that Plaintiff was using marijuana at that time. However, at the hearing in June 2011, Plaintiff testified that he had last used marijuana three to four years earlier. In her decision, the ALJ found that the medical evidence does not support the nature and severity of the seizure disorder as alleged by Plaintiff, noting the limited objective support for the frequency of seizures and essentially normal diagnostic and clinical findings, and then finding that "claimant's use of controlled substances undermines his credibility." (AR 33). Plaintiff argues that the ALJ failed to explain how Plaintiff's occasional use of marijuana would affect his seizure disorder. Plaintiff misunderstands the ALJ's

reference to his marijuana use. The ALJ is not suggesting that Plaintiff's seizures were the result of marijuana use but rather that he is not credible because of his inconsistent statements. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996).

Finally, Plaintiff argues that the ALJ's RFC analysis did not discuss the postical effects of Plaintiff's night-time seizures. This is incorrect. The ALJ noted that Plaintiff's wife indicated that his nighttime seizures made him "out of it." (AR 27). But, given that the ALJ found that Plaintiff's seizures were not as frequent as alleged, the postical effects of his seizures would not negatively impact his ability to do other work in the economy.

Given all the medical evidence in the record, the ALJ's credibility finding regarding Plaintiff's seizures was not "patently wrong." *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004) ("An ALJ is in the best position to determine a witness's truthfulness and forthrightness; thus, this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'"). The Court finds that the ALJ properly considered the testimony and medical evidence regarding Plaintiff's history of seizures and accounted for that history in formulating the RFC.

## B. Weight Given to Treating Psychologist Opinion

Plaintiff contends that the ALJ improperly weighed the opinion of Dr. Hafner-Nettleto, his treating psychologist. An ALJ must give the medical opinion of a treating doctor controlling weight as long as the

> treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record . . . . When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons . . . for the weight we give to your treating source's opinion.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); SSR 96-8p; SSR 96-2p, 1996 WL 374188 (Jul. 2, 1996). In other words, the ALJ must give a treating physician's opinion controlling weight if (1) the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques" and (2) it is "not inconsistent" with substantial evidence of record. *Schaaf*, 602 F.3d at 875.

The factors listed in paragraphs (c)(2)(i) through (c)(6) are the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors such as the familiarity of a medical source with the case. 20 C.F.R. §§ 404.1527(c), 416.927(c). "[I]f the treating source's opinion passes muster under [§ 404.1527(c)(2)], then there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it." *Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011) (internal quotation marks omitted) (quoting *Hofslien*, 439 F.3d at 376). Courts have acknowledged that a treating physician is likely to develop a rapport with his or her patient and may be more likely to assist that patient in obtaining benefits. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). An ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ gives good reasons. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Schaaf*, 602 F.3d at 875; *Skarbek*, 390 F.3d at 503. The ALJ cannot pick and choose the evidence that favors his final decision; rather, the ALJ must articulate his analysis well enough for an appellate court to follow and review his reasoning. *Diaz*, 55 F.3d at 307.

On September 7, 2010, Dr. Hafner-Nettleto completed a Mental Impairment Questionnaire for Plaintiff, noting that she had been meeting with Plaintiff twice a month since March 18, 2010, which is consistent with the treatment notes. On the Questionnaire, Dr. Hafner-Nettleto indicated that Plaintiff seemed appreciative of the use of individual therapy and medication but remained "quite depressed." (AR 680). In the areas of "functional limitation," Dr. Hafner-Nettleto found Plaintiff markedly limited as to restriction of activities of daily living, difficulties in maintaining social functioning, and deficiencies of concentration, persistence, and pace. Dr. Hafner-Nettleto opined that Plaintiff would miss more than four days of work per month due to his impairment. Dr. Hafner-Nettleto wrote that Plaintiff's "depression is quite severe and, as such, he might struggle with perceived criticism, socializing with coworkers, moving, and processing at an average pace." (AR 683).

The ALJ gave "very little" weight to this opinion of Dr. Hafner-Nettleto on the basis that it is "inconsistent with her limited treatment notes and findings," (AR 33), noting that Dr. Hafner-Nettleto treated Plaintiff for only a short period of six months and that Plaintiff did not respond to letters or calls prior to his discharge from treatment. Based on those facts, the ALJ concluded that Dr. Hafner-Nettleto's opinion appears to be based upon Plaintiff's subjective complaints and not on the medical evidence. The ALJ also found the opinion to be sympathetic and not supported by the evidence and treatment, listing minimal clinical findings by Dr. Hafner-Nettleto such as oriented times three, no psychotic symptoms, normal speech and tone, no problems with thought form or content, and good insight. The ALJ perceived these clinical findings to be inconsistent with severe functional limitations. Finally, without analysis, the ALJ found Dr. Hafner-Nettleto's opinion inconsistent with the later mental status examinations by Dr. Shahzaad.

The Court finds that the ALJ did not give good reasons for the weight given to Dr. Hafner-Nettleto's opinion. Most problematic is the discussion of the minimal clinical findings listed above to the exclusion of the repeated clinical findings throughout Dr. Hafner-Nettleto's treatment notes showing the extent to which Plaintiff negatively suffered from depression. These favorable treatment notes ignored by the ALJ tend to support Dr. Hafner-Nettleto's September 7, 2010 opinion and may have changed the ALJ's assessment of the opinion.

On March 18, 2010, Dr. Hafner-Nettleto described Plaintiff as dysthymic, irritable, and cynical and as demonstrating fatigue, worthlessness, helplessness, poor concentration, a depressed mood, and worry. On April 1, 2010, mild paranoia was observed and Plaintiff was tearful, anxious, irritable, depressed, and slightly paranoid. On April 15, 2010, Dr. Hafner-Nettleto noted that Plaintiff's thought content was notable for mild paranoia and that he reported increased depression and difficulty sleeping. On April 29, 2010, Dr. Hafner-Nettleto wrote that Plaintiff demonstrated some paranoid thinking. On May 19, 2010, Plaintiff had no gross disturbances in thought form or content except for slight paranoid ideation, and Dr. Hafner-Nettleto pointed out his thought patterns that were indicative of his depression. On May 27, 2010, Plaintiff was "clearly dysphoric, more so than in previous sessions." (AR 707). Plaintiff described his sleep as "terrible," stated that his whole body ached, and reported fatigue, anhedonia, guilt, and hopelessness.

On June 10, 2010, Plaintiff was dysthymic and irritable, describing anhedonia, poor self-esteem, hopelessness, anger, bodily aches and pains, and nightmares. On June 24, 2010, Dr. Hafner-Nettleto noted that Plaintiff continued to display signs of severe depression, hopelessness, helplessness, irritability, anhedonia, and worthlessness. Dr. Hafner-Nettleto described Plaintiff's feelings as "not true paranoia, per se" but rather viewing the world as to who is at "fault." (AR 718).

On July 7, 2010, Plaintiff appeared dysphoric and irritable/hostile, demonstrating poor self-esteem, avoidance of social situations, increased anger, and fears about his anger. Dr. Hafner-Nettleto wrote that it was difficult to differentiate between mild paranoid ideation versus an increase in anger resulting in feelings of threat. On July 22, 2010, Plaintiff seemed anxious and dysthymic and was tearful. On August 26, 2010, Dr. Hafner-Nettleto found Plaintiff to be severely depressed, with Plaintiff reporting sleep disturbance, depressed mood, loneliness, physical pain, fatigue, guilt, hopelessness, and feeling "lost" and disconnected from others. (AR 729).[1] On the December 22, 2010 Discharge Summary, Dr. Hafner-Nettleto rated Plaintiff as having made minimal improvement as to his anxiety and depression, opining that Plaintiff would likely benefit from medication management and therapy.

The ALJ failed to weigh, much less acknowledge, these favorable treatment notes in her decision to accord Dr. Hafner-Nettleto's opinion "very little weight." (AR 33). This failure appears in both the ALJ's recitation of the medical evidence on pages 30 and 31 as well as in the paragraph specifically dedicated to weighing Dr. Hafner-Nettleto's opinion. Perhaps the ALJ would have found these clinical observations insufficient to give Dr. Hafner-Nettleto's opinion controlling weight; however, the Court cannot know this because the ALJ did not discuss this favorable evidence. Moreover, although the ALJ properly discussed the length of the treating relationship, the ALJ does not explain why six months of bi-monthly treatment notes is an insufficient length of treatment for a psychologist to form an opinion about a patient. Without acknowledging or discussing these ongoing clinical observations that are consistent with Dr. Hafner-Nettleto's opinion, the ALJ did not

---

[1] Plaintiff asserts that Dr. Hafner-Nettleto also noted that Plaintiff had social withdrawal and demonstrated poor concentration, *see* (Pl. Br. 11); however, the Court is unable to locate any such notations by Dr. Hafner-Nettleto. Rather, on April 29, 2010, Dr. Hafner-Nettleto noted that Plaintiff described concerns about short-term memory.

build a logical bridge from the medical evidence to her decision. *See Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) ("[T]he judge noted that the plaintiff dresses appropriately, shops for food, prepares meals and performs other household chores, is an 'active participator[sic] in group therapy,' is 'independent in her personal hygiene,' and takes care of her 13-year-old son. This is just to say that the plaintiff is not a raving maniac who needs to be locked up.'").

The Commissioner contends that the ALJ "need not mention every strand of evidence in her decision but only enough to build an 'accurate and logical bridge' from evidence to conclusion," citing *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). Separately, the Commissioner makes the same argument, again citing *Simila*, to justify the ALJ's failure to cite the regular observations by Dr. Hafner-Nettleto regarding Plaintiff's irritability. But, in this instance, the ALJ has failed to build that logical bridge by mentioning only the evidence from Dr. Hafner-Nettleto's treatment notes that supports her decision and by consistently omitting the findings that may support Dr. Hafner-Nettleto's opinion. Although it is argued by the Commissioner, nowhere in her decision did the ALJ cite any failure by Dr. Hafner-Nettleto to explain how Plaintiff's irritability supported her ultimate conclusions. Nor did the ALJ rely, as the Commissioner does in the brief, on infrequent reporting of symptoms to conclude that Dr. Hafner-Nettleto's opinion was exaggerated; the ALJ simply did not mention those symptoms and findings.

Although the ALJ does note several times that Plaintiff had a depressed mood and was diagnosed with major depressive disorder, the failure to consider the treatment notes directly impacts the weight given to Dr. Hafner-Nettleto's opinion. The Commissioner also notes that the ALJ compared the initial GAF of 40 given by Dr. Hafner-Nettleto at intake with the GAF of 50 on the

Discharge Summary. Although this is an improvement, a GAF of 50 still represents severe symptoms. The ALJ does not discuss the meaning of the GAF scores.

The Commissioner would have the Court weigh the meaning of Dr. Hafner-Nettleto's favorable treatment notes to find that they "do not contain reports of symptoms or observations that would support the severe limitations to which she opined." (Def. Br. 9-10). But that is not the Court's role. In this instance, the Court cannot say that the error is harmless. The ALJ must discuss and weigh the evidence in the first instance. If the ALJ determines that this favorable evidence is still insufficient to support Dr. Hafner-Nettleto's January 2011 opinion, then the ALJ must make these findings in her decision. The ALJ was not permitted to disregard evidence that supports Dr. Hafner-Nettleto's opinion that Plaintiff was severely limited by his impairments. If the ALJ was unpersuaded by Dr. Hafner-Nettleto's treatment notes in relation to her ultimate opinion, the ALJ needed to explain her reasoning in her decision.

However, the Court finds that the ALJ's conclusion that Dr. Hafner-Nettleto's opinion is inconsistent with the later mental status examination of Dr. Shahzaad is, based on a facial review, supported by the evidence. Plaintiff was seen by Dr. Shahzaad on two occasions—on January 27, 2011, and March 17, 2011. On January 27, 2011, Dr. Shahzaad completed an initial evaluation of Plaintiff for depression. Dr. Shahzaad found Plaintiff mostly calm, cooperative, and forthcoming with information; Plaintiff's mood was neutral with a full affect; Plaintiff's thought process was logical and goal directed; Plaintiff's insight and judgment was fair; and Plaintiff's impulse control was fair. Dr. Shahzaad diagnosed Plaintiff with "major depression, recurrent, mild" and assigned a GAF of 50 to 55. This diagnosis was noted by the ALJ in the course of reciting the medical

history, but was not discussed as a reason for discounting Dr. Hafner-Nettleto's opinion based on Dr. Shahzaad's assessment.

On March 17, 2011, Plaintiff reported to Dr. Shahzaad that his mood was somewhat better but that he has days when he feels down. He also reported that his sleep was better while on Trazodone. Plaintiff reported to Dr. Shahzaad that he was irritated that he is not able to get disability benefits due to his seizure disorder and that he is unwilling to look into other fields because he would have to go to school. Dr. Shahzaad found Plaintiff to be calm, cooperative, and forthcoming with information and noted that Plaintiff's mood was neutral with a full affect and that Plaintiff had normal speech, logical and goal directed thought process, fair insight and judgment, and fair impulse control. Dr. Shahzaad found Plaintiff to be stable and continued all medication.

These observations by Dr. Shahzaad, on their face, are inconsistent with Dr. Hafner-Nettleto's opinion of greater limitations. However, in comparing these two opinions, the ALJ does not discuss the length or nature of the treatment by Dr. Shahzaad (a psychiatrist), which was only on two occasions, once for an initial evaluation and once for medication management, in contrast with the bi-weekly therapy sessions over six months by Dr. Hafner-Nettleto (a psychologist).

To the extent that Plaintiff argues that Dr. Shahzaad's GAF diagnosis of 50-55 suggests that he made a finding of moderate to serious difficulties in functioning, Plaintiff overreaches. First, a rating of 41-50 denotes serious symptoms, and 51-60 denotes moderate symptoms. Second, the law does not "require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Third, the GAF range was from the initial visit in January 2011. Dr. Shahzaad did not give an updated GAF score in March 2011, yet he found Plaintiff stable on his current medication and all of his mental status examination

findings were normal. However, because the Court is remanding for a proper discussion of Dr. Hafner-Nettleto's treatment notes, the ALJ shall also develop her analysis of why Dr. Shahzaad's mental status examination is inconsistent with Dr. Hafner-Nettleto's opinion.

Plaintiff also points to the weekly therapy treatment notes from a therapist with Dr. Shahzaad's office from January 25, 2011, through May 9, 2011, which include boxes checked next to mental status symptoms of perserverative thought process, poor eye contact, depressed mood, and dysphoric, irritable, constricted and/or depressed affect. *See* (AR 747, 748, 749, 750, 751, 752, 753, 754, 755, 756, 757, 758, 759, 764). As with Dr. Hafner-Nettleto's treatment notes, these therapy treatment notes contain a combination of these findings that appear to support the limitations in Dr. Hafner-Nettleto's opinion as well as boxes checked next to minimal or normal mental status symptoms such as attentive/cooperative, good eye contact, appropriate affect, relevant thought processes, well groomed appearance, oriented to date, place, person, and normal speech. And, as with Dr. Hafner-Nettleto's opinion, the ALJ failed to discuss these therapy treatment notes that appear consistent with Dr. Hafner-Nettleto's notes that support limitations flowing from Plaintiff's depression. This failure to discuss and weigh the favorable observations convolutes the path of the ALJ's reasoning. On remand, the ALJ shall discuss these favorable therapy treatment notes in weighing Dr. Hafner-Nettleto's opinion as well.

Plaintiff identifies memory testing done at the psychological consultative examination with Victor P. Rini, Psy. D., HSPP, on March 24, 2010, showing that Plaintiff's memory abilities were in the low average to extremely low average range. (AR 619). Plaintiff argues that this testing supports Dr. Hafner-Nettleto's opinion that Plaintiff was markedly limited in concentration, persistence, or pace, contrary to the ALJ's statement that Dr. Hafner-Nettleto's opinion was

"inconsistent with the medical evidence." (AR 33). Although the ALJ noted these test results in her recitation of the medical history, the ALJ did not discuss these results, which are part of the medical evidence, in relation to Dr. Hafner-Nettleto's opinion. If the ALJ believes that these test results and the results from Dr. Rini's consultative exams do not support Dr. Nettleto's opinion, the ALJ must explain why in the context of weighing Dr. Hafner-Nettleto's opinion.

Plaintiff also takes issue with the ALJ's conclusion that Dr. Hafner-Nettleto's opinion was based on Plaintiff's subjective complaints and, therefore, appeared to be sympathetic. (AR 33). The ALJ offered no explanation for this conclusion. First, mental conditions are evaluated by medical evidence that necessarily includes the claimant's symptoms. Second, although Dr. Hafner-Nettleto's treatment notes report the subjective symptoms Plaintiff described during sessions, the treatment notes are also replete with Dr. Hafner-Nettleto's own observations. On remand, should the ALJ again find that Dr. Hafner-Nettleto's opinion is based on Plaintiff's subjective complaints, the ALJ shall provide an explanation for this conclusion that discusses Dr. Hafner-Nettleto's professional observations and conclusions in the treatment notes and identifies what, if any, diagnostic tools the ALJ believed Dr. Hafner-Nettleto should have used in the treatment context to objectively verify Plaintiff's complaints. *See Pizano v. Colvin*, No. 13 C 4809, 2014 WL 1648815, at *3 (N.D. Ill. Apr. 22, 2014) (noting that the ALJ failed to explain why he concluded that a treating psychiatrist's opinion was based only on the claimant's subjective complaints as opposed to based on accepted methods of mental health diagnosis).

The ALJ seems to place some emphasis on the fact that Plaintiff never got back in touch with Dr. Hafner-Nettleto before he was discharged from her care. However, Plaintiff originally stopped seeing Dr. Hafner-Nettleto in September 2010 because he lost his Medicaid coverage; in November,

Dr. Hafner-Nettleto sent Plaintiff a 1-day letter, to which Plaintiff responded, saying that he had Medicaid again; and only then was Dr. Hafner-Nettleto unable to reconnect with Plaintiff to schedule an appointment, despite several phone calls, including a final voicemail message on December 15, 2010, to which Plaintiff did not respond. The ALJ's failure to discuss all these facts along with the ongoing weekly therapy sessions through Dr. Shahzaad's office beginning in January 2011 makes it appear that the ALJ unfairly downplayed Plaintiff's ongoing symptoms and treatment.

Finally, Plaintiff argues that the ALJ failed to discuss the factors set out in 20 C.F.R. §§ 404.1527(c), 404.927(c). In this instance, the ALJ noted that Dr. Hafner-Nettleto was a counselor and noted her degrees of Psy.D. and HSPP, noted the length of treatment, and mentioned clinical findings. Therefore, on its face, the decision discusses the factors. However, for the reasons set forth above, remand is required for a proper analysis of the factors.

## C. Credibility

In making a disability determination, social security regulations provide that the Commissioner must consider a claimant's statements about his symptoms, such as pain, and how the claimant's symptoms affect his daily life and ability to work. *See* 20 C.F.R. §§ 404.1529(a); 416.929(a). The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)    The individual's daily activities;
(2)    Location, duration, frequency, and intensity of pain or other symptoms;
(3)    Precipitating and aggravating factors;
(4)    Type, dosage, effectiveness, and side effects of any medication;
(5)    Treatment, other than medication, for relief of pain or other symptoms;
(6)    Other measures taken to relieve pain or other symptoms;
(7)    Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). In making a credibility determination, Social Security Ruling 96-7p provides that the ALJ must consider the record as a whole, including objective medical evidence, the claimant's statement about symptoms, any statements or other information provided by treating or examining physicians and other persons about the conditions and how the conditions affect the claimant, and any other relevant evidence. *See* SSR 96-7p; *see also* §§ 404.1529(c)(1); 416.929(c)(1). "Because the ALJ is 'in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (quoting *Skarbek*, 390 F.3d at 504-05); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)).

In assessing Plaintiff's credibility, the ALJ thoroughly considered these factors. The ALJ noted Plaintiff's and his wife's subjective statements in his application for benefits and hearing testimony, including statements as to his symptoms and how they limited him as well as factors that relieved his symptoms. The ALJ considered the normal to mild objective medical evidence, including a normal to mild consultative examination and the conservative treatment history for both his physical and mental impairments. The ALJ considered Plaintiff's medications, the opinions of the physicians of record, Plaintiff's activities of daily living, and his work history.

Plaintiff's only criticism of the ALJ's credibility determination is that the ALJ failed to analyze the credibility finding of state agency reviewing physicians Dr. Kladder and Dr. Lavallo in violation of SSR 96-7p. Plaintiff offers no specifics about the two opinions or how consideration by

the ALJ of these credibility findings within the opinions would have changed the overall credibility determination. As an initial matter, Plaintiff fails to note that the ALJ gave great weight to and agreed with state agency reviewing psychologist Dr. Horton's opinion that Plaintiff retained the ability to perform routine tasks on a sustained basis without extraordinary accommodations.[2] Dr. Horton cited the mild exam findings of consulting psychologists Dr. Park and Dr. Rini. And, Dr. Horton found Plaintiff to be credible.

On October 27, 2009, Dr. Kladder completed a psychiatric review technique form on which he found that "claimant's allegations appear credible." (AR 56). What Plaintiff fails to acknowledge is that Dr. Kladder also found Plaintiff to have mild limitations in restriction of activities of daily living, in difficulties in maintaining social functioning, and in difficulties in maintaining concentration, persistence, and pace and that Dr. Kladder found that Plaintiff's condition was *not* severely limiting at that time.

Second, Plaintiff cites the November 19, 2009 Physical Residual Functional Capacity Assessment of F. Lavallo, M.D., on which his only typed comments regarding the severity of Plaintiff's symptoms was the expression "Clmt appears credible" without further elaboration. (AR 577). Again, however, Plaintiff fails to acknowledge that this comment was made in the context of finding that Plaintiff could perform a restricted range of medium exertional work, limiting Plaintiff only in his ability to climb and balance and his exposure to dangerous machinery. Plaintiff also fails to note that the ALJ gave Dr. Lavallo's opinion great weight.

Neither Dr. Horton, Dr. Kladder, nor Dr. Lavallo offered any explanation or analysis of their determinations that Plaintiff was credible. However, they did explain their residual functional

---

[2] In the opening brief, Plaintiff identifies only the opinions of Dr. Kladder and Dr. Lavallo; Plaintiff does not discuss Dr. Horton's opinion. Dr. Horton's opinion is raised for the first time by the Commissioner in the response brief.

capacity findings, on which the ALJ relied. Any error the ALJ committed by not specifically citing the two state agency reviewing physician's remarks as to Plaintiff's credibility was inconsequential and harmless because there is no reason to believe that remand on that basis would lead to a different decision. And Plaintiff has not met his burden of showing otherwise. *See Parker v. Astrue*, 597 F.3d 920, 924 (7th Cir. 2010).

The ALJ's credibility determination was not patently wrong. However, because the Court is remanding for a proper weighing of Dr. Hafner-Nettleto's opinion, the ALJ will have an opportunity to incorporate the consultative reviewer's credibility findings in the ALJ's credibility determination.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the relief sought in Plaintiff's Memorandum in Support of [His] Motion for Summary Judgment [DE 18], **REVERSES** the final decision of the Commissioner of Social Security, and **REMANDS** this matter for further proceedings consistent with this Opinion and Order.

So ORDERED this 28th day of August, 2014.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record